UNITED STATES DISTRICT COURT
SOUTHER DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DAN ABRAMS, DAVID BEN-ASHER, ADRIAN
BERNICK, DEBORAH BERNICK, JOHN AND
KAREN BEIERSCHMITT, SARA CAVENDISH,
JEFFREY & KATHERINE CARLSON, STEVE
D'ELIA, GINETTE DAVEDIUK, RICH
DELL'ANNO, JACQUELINE DEDERICH,
SANDRA DICK, TED DOUKAS, JODI
FRIEDMAN, STEVEN FRIEDMAN, ARNOLD
FUCHS, BARBARA AND RICHARD GAMBINO,
ETHELL GELLER, MARGARET GERSON,
AARON GINDI, ERIC GORBITZ, BECKY
GRIMM, MICHAEL HAMBY, JOSEPH
KANNER, PATRICIA KOZU, FRANK LEIBER,
CAROLINE LIEBERMAN, KENNETH LUFT,
WAYNE MARGOLIES, GWENN MARTIN,
JAMES MATTHEWS, LESLIE NANBERG,
PATRICIA OPPITO, GORDON OSTOJIC,
CAROL POSNER, ED POTEAT, DEVINENI AND
BASABI RATNAM, FRED REYNOLDS, OLIVER
REYNOLDS, RANDY REYNOLDS, ROSANNA
SATTLER, TAMMIE SAVAGE, VINCENT
SHIRO, JAY SILVERMAN, STEVEN SMALL,
ED SMITH, BURTON SULZER, ERIC SWANN,
LENARD THYLAN, ASHOK AND BANSIE
VASVANI, and JOY WILLIG,

     Plaintiffs,

   -against-

LIFE MEDICAL TECHNOLOGIES, INC., CAROL
FITZGERALD, JOE SANTANA, PETER KELLY,
and TERRY LIERMAN,

     Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No.

14 CV 3464



**COMPLAINT**

**JURY TRIAL DEMANDED**

  Plaintiffs Dan Abrams, David Ben-Asher, Adrian Bernick, Deborah Bernick, John and

Karen Beierschmitt, Sara Cavendish, Jeffrey & Katherine Carlson, Steve D'Elia, Ginette

Davediuk, Rich Dell'Anno, Jacqueline Dederich, Sandra Dick, Ted Doukas, Jodi Friedman,

Steven Friedman, Arnold Fuchs, Barbara & Richard Gambino, Ethell Geller, Margaret Gerson,

Aaron Gindi, Eric Gorbitz, Becky Grimm, Michael Hamby, Joseph Kanner, Patricia Kozu, Frank

Leiber, Caroline Lieberman, Kenneth Luft, Wayne Margolies, Gwenn Martin, James Matthews,

Leslie Nanberg, Patricia Oppito, Gordon Ostojic, Carol Posner, Ed Poteat, Devineni and Basabi

Ratnam, Fred Reynolds, Oliver Reynolds, Randy Reynolds, Rosanna Sattler, Tammie Savage,

Vincent Shiro, Jay Silverman, Steven Small, Ed Smith, Burton Sulzer, Eric Swann, Lenard

Thylan, Ashok and Bansie Vasvani, and Joy Willig ("Plaintiffs"), by and through their

undersigned counsel, Napoli Bern Ripka Shkolnik, LLP, as and for their complaint against

Defendants Life Medical Technologies, Inc. ("Life Medical"), Carol Fitzgerald, Joe Santana,

Peter Kelly and Terry Lierman (the "Director Defendants") (collectively, "Defendants") herein

allege as follows:

## INTRODUCTION

1.      This action seeks rescission of Plaintiffs' investments in Life Medical pursuant to

a private offering procured by fraud in violation of federal and state securities laws, or in the

alternative, for the recovery of damages for those same acts.  Additionally, this action seeks

damages arising from Defendants' breach of fiduciary duties of care and loyalty, negligence and

unjust enrichment in connection with corporate malfeasance.  Defendants' wanton, malicious,

oppressive, and willful misconduct supports an award of punitive damages pursuant to New

York, Illinois and Pennsylvania law.

2.      Life Medical is a technology company who claimed to possess certain patents,

regulatory clearance and strategic business partnerships related to a medical device called

BreastCare DTS ("BreastCare Device") that was intended to be used as an adjunct to the

standard mammography procedures for the early detection of breast disease, including breast cancer.

3.      Life Medical, through Fitzgerald, solicited investors to purchase units in Life Medical and provided potential accredited investors with a private placement memorandum ("PPM") and offering materials pursuant to Regulation D and Section 4(6) of the Securities Act of 1933.

4.      Fitzgerald solicited the plaintiffs to invest in Life Medical for the explicit purpose of manufacturing the BreastCare Device and bringing it to the market.  Plaintiffs collectively invested $3,779,483.00 in Life Medical, from 2007 to date.

5.      Life Medical and Director Defendants intentionally misrepresented information to Plaintiffs in connection with the private solicitation of investments in Life Medical, including: 1) understating the amount of funds required and/or how the funds invested would be used to bring the BreastCare Device to the market; 2) failing to disclose that Life Medical intended to use the investment funds to satisfy prior legal settlements and obligations directly; 3) the status of the BreastCare Device's regulatory approvals and patents; 4) Life Medical's manufacturing capabilities; 5) the BreastCare Device's international marketing initiatives and prospect for sales in overseas markets; 6) Life Medical's evaluation by Atlantic Accelerator, Ltd.; 7) Life Medical's exclusive distribution agreement with a Canadian healthcare company; 8) the relevancy of BreastCare Device's clinical studies; 9) the accuracy and legitimacy of the financial data and financial projections; and 10) failing to provide shareholders updated financial data and disclosures.

6.      Life Medical and Director Defendants also grossly mismanaged the day-to-day operations of the company without any rational purpose and recklessly squandered corporate

resources through unnecessary legal fees, personal use, including syphoning corporate assets for

illicit drug use by Fitzgerald, and corporate waste.  Life Medical and Director Defendants

concealed the extent of the corporate malfeasance by negligently maintaining and/or fraudulently

manipulating Life Medical's corporate books and records, including financial documents, during

the relevant time period.

7.      As a direct and proximate result of Defendants' fraud, gross negligence and

wanton, malicious, oppressive, and willful misconduct, Plaintiffs suffered a complete loss of

their investments for which Defendants are liable and Plaintiffs are owed damages.   Defendants'

wanton, malicious, oppressive, and willful misconduct requires an award of punitive damages so

as to act as retribution against Defendants, deter Defendants from committing similar wrongs

against investors in the future (especially if Life Medical ever becomes a public company) and

deter others start-up companies from similar conduct.

## PARTIES

8.      Plaintiff Dan Abrams is a citizen of the State of Florida and resides at 17240

Germano Court, Naples, FL 34110. Mr. Abrams invested $30,000 in Life Medical based upon

Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's

PPM and offering materials.

9.      Plaintiffs David Ben-Asher and Sandra Y. Dick are citizens of the State of New

Jersey and reside at 279 Tillou Road, South Orange, New York 07079.  Mr. Ben-Asher and

Ms. Dick invested $75,000 in Life Medical based upon Ms. Fitzgerald's representations, as well

as the misrepresentations contained in Life Medical's PPM and offering materials.

10.      Plaintiff Adrian Bernick is a citizen of the State of New York and resides at 70

East 10th Street, Apt. 3F, New York, New York 10003.  Ms. Bernick invested $10,000 in Life

Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

11.     Plaintiff Deborah Bernick is a citizen of the State of New York and resides at 180 Montague Street, Apt. 28A, Brooklyn, New York 11201.  Ms. Bernick invested $94,000.00 in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

12.     Plaintiffs John and Karen Beierschmitt are citizens of the State of Pennsylvania and reside at 55 Monteview Drive, York, Pennsylvania 17404.  Mr. and Mrs. Beierschmitt invested $95,000 in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

13.     Plaintiff Sara Cavendish is a citizen of the State of Maryland and resides at 8304 Oakford Place, Silver Spring, Maryland 20910.  Ms. Cavendish invested $10,000 in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

14.     Plaintiffs Jeffrey & Katherine Carlson are citizens of the State of Minnesota and reside at 600 Deer Trail, Montgomery, Minnesota 56069.  Mr. and Mrs. Carlson invested $5,000 in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

15.     Plaintiff Steve D'Elia is a citizen of the State of Pennsylvania and resides at 27 Harrison Drive, Newtown Square, Pennsylvania 19073.  Mr. D'Elia invested $250,000 in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

16.     Plaintiff Ginette Davediuk is a citizen of Canada and resides at 8535 74 Avenue, Edmonton, Alberta, Canada T6C 0G1.  Mr. Davediuk invested $1,500 in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

17.     Plaintiff Rich Dell'Anno is a citizen of the State of New Jersey and resides at 8 Shady Tree Lane, Colts Neck, New Jersey 07722.  Mr. Dell'Anno invested $500,000 based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

18.     Plaintiff Jacqueline Dederich is a citizen of Canada and resides at 251 Burton Road, NW, Edmonton, Alberta, Canada T6R 1P6.  Ms. Dederich invested $19,893.00 in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

19.     Plaintiff Jodi Friedman is a citizen of the State of New York and resides at 94 E 4th Street, #802, New York, New York 10003.  Ms. Friedman invested $3,000 in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

20.     Plaintiff Arnold Fuchs is a citizen of the State of New York and resides at 4 E 8th Street, 4R, New York, New York 10003.  Mr. Fuchs invested $10,000 in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

21.     Plaintiffs Barbara & Richard Gambino are citizens of the State of New York and reside at 146 E 49th Street, Apt. 8B, New York, New York 10017.  Mr. & Mrs. Gambino

invested $100,000 in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

22.     Plaintiff Ethell Geller is a citizen of the State of New York and resides at 333 Central Park West, Apt. 92, New York, New York 10025.  Ms. Geller invested $75,500 in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

23.     Plaintiff Meg Gerson is a citizen of the State of New York and resides at 392 Central Park West, #3P, New York, New York 10025.  Ms. Gerson invested $15,000 in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

24.     Plaintiff Aaron Gindi is a citizen of the State of New York and resides at 960 Westwood Road, Woodmere, New York 11598.  Mr. Gindi invested $25,000 in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

25.     Plaintiff Eric Gorbitz is a citizen of the State of New Jersey and resides at 358 Forest Street, Kearny, New Jersey 07032.  Mr. Gorbitz invested $10,000 in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

26.     Plaintiff Becky Grimm is a citizen of the State of Illinois and resides at 2421 Kentucky Road, Quincy, Illinois 62301.  Dr. Grimm invested $25,000 in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

27.      Plaintiff Michael Hamby is a citizen of the State of California and resides at 6905 Mystery Creek Lane, Granite Bay, California 95746.  Mr. Hamby invested $500,000 based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

28.      Plaintiff Joseph Kanner is a citizen of the State of New York and resides at 347 West 57th Street, New York, New York 10019.  Mr. Kanner invested $15,000 in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

29.      Plaintiff Patricia Kozu is a citizen of the State of New York and resides at 220 West 98th Street, #5B, New York, New York 10025.  Ms. Kozu invested $25,000 in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

30.      Plaintiff Frank Leiber is a citizen of the State of New York and resides at 3231 Sharon Turnpike, Millbrook, NY 12545.  Mr. Leiber invested $50,000 in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

31.      Plaintiff Caroline Lieberman is a citizen of the State of New York and resides at 15 Central Park West, New York, New York 10023.  Ms. Lieberman invested $20,000 in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

32.      Plaintiff Kenneth Luft is a citizen of Canada and resides at 208 Whiston Road, Edmonton, Alberta, Canada T6M 2C8.  Mr. Luft invested $50,000 in Life Medical based upon

Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

33.     Plaintiff Wayne Margolies is a citizen of the State of New York and resides at 32 Clinton Street, New York, New York 10002. Mr. Margolies invested $50,000 in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

34.     Plaintiff Gwenn Martin is a citizen of the State of New York and resides at 420 East 64th Street, #W-2A, New York, New York 10065. Ms. Martin invested $30,000 based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

35.     Plaintiff James Matthews is a citizen of the State of Maryland and resides at 2110 Priest Bridge Drive, Suite #4, Crofton, Maryland 21114. Dr. Matthews invested $100,000 in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

36.     Plaintiff Leslie Nanberg is a citizen of the State of Massachusetts and resides at 35 Marlborough Street, Boston, Massachusetts 02116. Mr. Nanberg invested $50,000 based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

37.     Plaintiff Patricia Oppito is a citizen of the State of New York and resides at 300 East 46th Street, Apt. 9J, New York, New York 10017. Ms. Oppito invested $40,000 in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

38.    Plaintiff Gordon Ostojic is a citizen of the State of New York and resides at 43 Meadow Glen Road, Northport, New York 11768.  Mr. Ostojic invested $17,500 in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

39.    Plaintiff Carol Posner is a citizen of the State of New York and resides at 215 East 68th Street, Apt. 33E, New York, New York 10065.  Ms. Posner invested $125,000 in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

40.    Plaintiff Ed Poteat is a citizen of the State of New York and resides at 1735 Park Avenue, #201, New York, New York 10035.  Mr. Poteat invested in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

41.    Plaintiffs Devineni and Basabi Ratnam are citizens of the State of New York and reside at 1050 West Shore Road, Oyster Bay, New York 11771.  Mr. and Mrs. Ratnam invested $10,000 in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

42.    Plaintiff Fred Reynolds is a citizen of the State of Louisiana and resides at 13226 East Adams Road, Hammond, Louisiana 70403.  Mr. Reynolds invested $20,000 in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

43.    Plaintiff Oliver Jack Reynolds is a citizen of the State of Florida and resides at 1503 Tin Cup Court, Unit 202A, Panama City Beach, Florida 32413.  Mr. Reynolds invested

$400,000 in Life Medical in 2009 and 2011 based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

44.     Plaintiff Randy Reynolds is a citizen of the State of Louisiana and resides at 809 Solomon Place, New Orleans, Louisiana 70119.  Mr. Reynolds invested $10,000 in Life Medical in 2008 based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

45.     Plaintiff Rosanna Sattler is a citizen of the State of Massachusetts and resides at 95 Towbridge Street, Cambridge, Massachusetts 02138.  Ms. Sattler invested $10,000 in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

46.     Plaintiff Tammie Savage is a citizen of Canada and resides at 7462 Singer Landing, Edmonton, Alberta, Canada T6R 3S3.  Ms. Savage invested $25,000 in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

47.     Plaintiff Vincent Schiro is a citizen of the State of Louisiana and resides at 1023 North Hullen Street, Metairie, Louisiana 70001.  Mr. Schiro invested $40,000 in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

48.     Plaintiff Jay Silverman is a citizen of the State of New York and resides at 1225 Franklin Avenue, Suite 325, Garden City, New York 11530.  Mr. Silverman invested $25,000 in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

11

49.    Plaintiff Steven Small is a citizen of the State of New York and resides at 435 East 79th Street, Apt. 2F, New York, New York 10075.  Mr. Small invested $100,000 in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

50.    Plaintiff Ed Smith is a citizen of the State of New York and resides at 1120 Avenue of the Americas, #1505, New York, New York 10036.  Mr. Smith invested $50,000 in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

51.    Plaintiff Burton Sulzer is a citizen of the State of New York and resides at 333 East 66th Street, New York, New York 10065.  Mr. Sulzer invested $75,000 in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

52.    Plaintiff Eric Swann is a citizen of the State of Massachusetts and resides at 65 East India Row, #23F, Boston, Massachusetts 02110.  Mr. Swann invested $150,000 in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

53.    Plaintiff Lenard Thylan is a citizen of the State of New York and resides at 710 Park Avenue, New York, New York 10021.  Mr. Thylan invested $25,000 in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

54.    Plaintiffs Ashok and Bansie Vasvani are citizens of the State of New York and reside at 37 Sidney Place, Brooklyn, New York 11201.  Mr. and Mrs. Vasvani invested $25,000

in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

55.     Plaintiff Joy Willig is a citizen of the State of Louisiana and resides at 1107 South Peters Street, Unit #223, New Orleans, Louisiana 70130.  Ms. Willig invested $5,000 in Life Medical based upon Ms. Fitzgerald's representations, as well as the misrepresentations contained in Life Medical's PPM and offering materials.

56.     Defendant Life Medical Technologies, Inc. is a privately held Delaware corporation organized and existing under the laws of the State of Delaware with a principal place of business located at IBM Hudson Valley Research Park Building 320A-1, 2070 Route 52, in Hopewell Junction, New York 12533.

57.     Defendant Joe Santana ("Santana") was the Chairman of the Board of Directors of Life Medical from September 22, 2010 to the present.  Upon information and belief, Santana is a citizen of the State of Connecticut and resides at 431 Three Mile Hill Road, Middlebury, Connecticut.

58.     Defendant Carol Fitzgerald ("Fitzgerald") is the former CEO and President of Life Medical.  Fitzgerald was a director of Life Medical starting June 1, 2008.  Fitzgerald was the Vice Chairman of the Board of Directors and Executive Vice President of Business Development.  Upon information and belief, Fitzgerald is a citizen of the State of New York and resides at 4438 Chubb Hollow Road, Dundee, New York.

59.     Defendant Peter Kelly ("Kelly") is on the Board of Directors of Life Medical. Upon information and belief, Kelly is a citizen of the State of Connecticut and resides at 14 Katie Joe Lane, Branford, Connecticut.

60.     Defendant Terry Lierman ("Lierman") is on the Board of Directors of Life Medical.  Upon information and belief, Lierman is a citizen of the State of Maryland and resides at 7200 Delfield Street, Chevy Chase, Maryland.

## JURISDICTION AND VENUE

61.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims herein arise under § 10(b) of the Exchange Act of 1934, 15 U.S.C. Sec. 78j(b), and Rule 10b-5 promulgated by the SEC thereunder at 17 C.F.R. § 240.10b-5.  This Court also has supplemental jurisdiction over Plaintiffs' state law and common law claims pursuant to 28 U.S.C. § 1367(a) because they are related to the claims herein over which the Court has original jurisdiction and form part of the same case or controversy.

62.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Life Medical and the Director Defendants regularly conduct business within this District, and many of the acts giving rise to the violations complained of herein took place in this District.

## FACTUAL BACKGROUND

**A.     Life Medical and the BreastCare Device**

63.     In 2007, Life Medical purchased from Scantek Medical, Inc. ("Scantek") the exclusive licensing rights in North America for a Scantek medical device that has since become the BreastCare Device.

64.     In December 2008, Scantek filed for bankruptcy protection under Chapter 11.

65.     On November 23, 2009, Life Medical was the successful bidder for, and purchased, substantially all of the assets of Scantak including the equipment necessary to manufacture the BreastCare Device and a related patent designed to assist in the early detection of breast cancer.  *See* Attachment A, PPM, pg. 12.

66.     The BreastCare Device is described as follows:

> The patented device consists of two, soft, disposable pads that are
> lightweight and non-invasive, and are applied around surface of
> each breast and worn for 15 minutes.  1,188 temperature sensitive
> sensors embedded in wafer-thin foil layers in each pad sense heat
> in the underlying tissues, changing color and highlighting regional
> temperature differences which can signify abnormal cellular
> activity associated with tumors or metabolic changes.

*Id.*, at 9.

67.     The purchase of the Scantek assets gave Life Medical the ability to develop, manufacture and market the BreastCare Device that can potentially make a significant impact in the early detection of breast cancer on a low cost basis.

68.     According to Life Medical's PPM, since its inception, Life Medical has been allegedly engaged in the following business activities:

    a.  Registering the BreastCare Device in several countries;

    b.  Capital raising;

    c.  Development of a new manufacturing line;

    d.  Development of the BreastAware education program;

    e.  Assembling medical and business advisory boards, etc.

69.     In or around 2011, Life Medical allegedly retained Fala Technologies ("Fala") to design and build manufacturing lines to manufacture the BreastCare Device.  *See* Attachment A, PPM, pg. 12.  The manufacturing facility for the BreastCare Device was expected to be operational after the first quarter of 2012 "assuming the Company [Life Medical] receives sufficient funding" through the offering.

70.     Life Medical is a development stage company, which means that it devotes a majority of its resources to the establishment of a new business and has not begun or produced

any product sales or revenue. Life Medical is presently in its eighth operating year and has not

reported any revenues, and only considerable obligations. As of the date of this Complaint, Life

Medical has not manufactured a single BreastCare Device.

**B.    Director Defendants have Presided over a**
**Dramatic Decline in the Value of Life Medical**

71.    At the end of fiscal year 2009, Life Medical was valued at $1.00 per share or

$32,688,996 (based upon 32,688,996 common shares outstanding) in Note 2 of its financial

statements and audit report.

72.    At the end of fiscal year 2011, after the Director Defendants had served on the

board of directors for several years, Life Medical reported a value of $.0002 per share or

$7,856.30 in its 2011 federal tax returns.

73.    In the period from 2008 through the present, Director Defendants expended

significant efforts and Life Medical's resources (and Plaintiffs' investment) fortifying their

control of Life Medical through a series of share issuances to themselves, retaining legal counsel

paid from Life Medical's funds to protect legal challenges to their incumbency, and overpaying

for the services of officers and directors who were loyal to Fitzgerald personally over the

interests of Life Medical and its shareholders.

74.    During this same time period, Director Defendants negligently allowed the

revenue-generating operations of Life Medical remain idle. As a result, there is little prospect of

the commencement of production and marketing of the BreastCare Device in the near future, and

Life Medical continues to endure operational losses throughout this period.

75.    Director Defendants' gross negligence in permitting Life Medical to remain

operationally idle is problematic because the patent Life Medical acquired from Scantek, the sole

16

asset owned by the company, provides a limited time (less than 5 years remaining) for Life

Medical to exclusively manufacture and market the BreastCare Device.

**C.**    **Plaintiffs' Investments in Life Medical**

76.    Starting in or around December 2007, Fitzgerald met with Plaintiffs and presented

them with Subscription Agreements to invest in Life Medical.  Through her tenure, Fitzgerald

solicited Plaintiffs to invest in Life Medical for the explicit purpose of manufacturing the

BreastCare Device and bringing it to the market.  Further, through this time period, Plaintiffs

purchased $3,779,483.00 worth of units in Life Medical.

**D.**    **Defendants Underestimated and/or Misallocated Investment Funds**

77.    Despite representations to Plaintiffs, Life Medical and Director Defendants were

unable to follow through with plans to, *inter alia*, establish a manufacturing facility, market the

BreastCare Device, maintain the patents and regulatory clearance(s) in good standing, and

ultimately launch the BreastCare Device product domestically and internally.

**E.**    **Defendants Failed to Maintain Patents and Secure Regulatory Approval**

78.    Defendants intentionally misrepresented Life Medical's intellectual property

rights for the BreastCare Device.  In the PPM, Defendants erroneously stated, 44 times, that they

maintained a patent for the BreastCare Device.  For example, the PPM states:

> Life MT acquired from a predecessor company substantially all of
> the assets including the FDA clearance for the BreastCare DTS™
> device, the patent for the BreastCare DTS™ device, and the patent
> for the Prostate Cancer device. Additional assets acquired include
> registrations in other countries, trademarks, manufacturing and
> warehouse equipment, inventory and office supplies.

*See* Attachment A, pg. 11.

79.    However, upon information and belief, Life Medical allowed the aforementioned

patents to lapse because certain patent fees were not paid.  As a result, upon information and

belief, Life Medical no longer maintained a valid patent for the BreastCare Device as of the August 2011.

80.     The status and validity of Life Medical's intellectual property rights were entirely under Defendants' control and access at all times relevant to this dispute.  Thus, Defendants knew or should have known the status and validity of Life Medical's intellectual property rights when the PPM was presented to the plaintiffs.

81.     Defendants intentionally misrepresented that they had obtained Federal Drug Administration (FDA) clearance for the BreastCare Device.  *See* Attachment A, pg. 9 ("*BreastCare DTS*™ has received FDA 510K clearance for marketing in the United States to be used by physicians as an adjunct to routine physical examination including palpation, mammography and other established procedures for the detection of breast disease including breast cancer.").  Upon information and belief, Defendants negligently allowed the FDA 510K clearance to lapse for a substantial period of time due to failure to pay the requisite fees.

82.     Defendants' failure to obtain FDA 510K clearance depreciated the value of Life Medical to other potential investors and prohibited Defendants from following through with plans to bring the BreastCare Device to market.

**F.     Life Medical was not a "Women-Owned Business"**

83.     Defendants intentionally misrepresented Life Medical's status as a "Women-Owned Business" that would allow participation in many grants and programs.  *See* Attachment A, pg. 9 ("Life MT is currently a Women-Owned Business and is in the process of obtaining certification of such fact.").

84.     Upon information and belief, Defendants failed to obtain certification that Life Medical was a "Women-Owned Business," and was not a "Women-Owned Business" as of

August 2011 when Plaintiffs invested in units of Life Medical.  As a result, Defendants missed an opportunity to participate in many grants and programs designed to assist female-orientated businesses that could have provided additional funding and improved Life Medical's financial position.

### G.    Defendants' Representations Concerning Life Medical's Manufacturing Capability

85.    Defendants underestimated the amount of time it would take to begin manufacturing the BreastCare Device.  The PPM states: "Assuming receipt of the necessary funds, production at the Life MT facility is projected to begin after first quarter 2012." *See* Attachment A, pg. 10.  However, Life Medical had not achieved sufficient progress in terms of developing the manufacturing facility as of August 2011.  Therefore, Defendants' estimate for the amount of time it would take to being manufacturing was nearly impossible to achieve and wholly inaccurate.

86.    In or about July 2011, Fitzgerald represented that a "significant" amount of the funds were to be paid to Fala to satisfy approximately $700,000 in debt incurred in the designing of the manufacturing line on behalf of Life Medical.  As discussed above, Defendants intentionally diverted the funds away from Fala in order to satisfy a legal settlement that had already been incurred, despite representations that all prior legal matters had been resolved.

87.    Upon information and belief, Life Medical currently owes Fala somewhere between $1.0 million to $1.4 million.

88.    Defendants also intentionally misrepresented Life Medical's manufacturing capabilities and that Life Medical would manufacture the BreastCare Device in house.  The PPM states:

> Prior to moving in to IBM's facility, Life MT intended to use
> contract manufacturing for at least the first year of production.

19

> The infrastructure and support services at the IBM facility and the
> design and manufacturing services available through Fala have
> enabled Life MT to undertake to manufacture its BreastCare
> DTS<sup>TM</sup> in house.

*See* Attachment A, pg. 18.

89.    However, upon information and belief, Defendants overstated the significance of

the IBM facility and Fala's design and manufacturing services, such that Life Medical was not

able to manufacture the BreastCare Device in house.  As a result, Life Medical would have to

outsource the manufacturing of the BreastCare Device to Fala, which completely changed Life

Medical's cost of producing the BreastCare Device and the viability of bringing the BreastCare

Device to market.

90.    Additionally, since Life Medical would be outsourcing the manufacturing of the

BreastCare Device to Fala, the space rented at IBM's facilities was unnecessary and wasteful.

Upon information and belief, Life Medical owes IBM in excess of $100,000 in back rent.

## H.    Defendants' Misrepresentations Concerning Life Medical's International Marketing

91.    Defendants intentionally misrepresented the BreastCare Device's registration in

foreign countries.  The PPM states:

> BreastCare DTS<sup>TM</sup> has been registered in Europe, Canada, Mexico,
> Brazil and Russia.  These registrations were obtained by the
> company from which Life MT purchased the rights to the device
> prior to purchasing the patent for the device.  Life MT will be
> verifying and updating these registrations as well as assessing prior
> distribution relationships.

*See* Attachment A, pg. 11.

92.    Defendants' representations that the BreastCare Device had been registered in

Europe, Canada, Mexico, Brazil and Russia was misleading because it led the plaintiffs  to

believe the BreastCare Device was actually registered in Europe, Canada, Mexico, Brazil and Russia

93.     Defendants did not verify or update any of the registrations identified in the PPM, through their own negligence.

94.     Upon information and belief, the BreastCare Device did not possess registration in any of the countries identified in the PPM because Life Medical negligently allowed the aforementioned registrations to lapse because certain registration fees were not paid.

95.     With respect to international marketing initiatives, Defendants represented: "Life MT is involved in discussions with governmental and private distribution entities in Canada, Mexico, Brazil, Europe, MENA Region, South Africa, India, and Russia to expand its distribution to these countries.  The Company is at contract stage for distribution in two countries."  *See* Attachment A, pg. 12.

96.     Defendants misrepresented its involvement in discussions governmental and private distribution entities because Defendants were not involved in discussions with any governmental or private distribution entities identified in the PPM at the time of certain plaintiff's investment in 2011 or at any time prior thereto.

97.     Upon information and belief, Defendants were not at contract stage for distribution in two countries at the time of the plaintiff's investment in 2011 or at any time prior.

98.     Defendants intentionally misrepresented to Plaintiffs that Life Medical was being evaluated by Atlantic Accelerator, Ltd, which was founded to "accelerate development of improved high value medical solutions for hospital-managed care."  *See* Attachment A, pg. 12.

99.     Upon information and belief, Life Medical was not being evaluated by Atlantic Accelerator, Ltd, at the time of the plaintiffs' investment in 2011 or at any time prior.

21

100.     Defendants intentionally misrepresented to Plaintiffs that Life Medical was in the "final stages of signing an exclusive distribution agreement with a large Canadian healthcare company."  *See* Attachment A, pg. 12.

101.     Upon information and belief, Life Medical was not in the final stages of signing an exclusive distribution agreement with a large Canadian healthcare company at the time of the plaintiffs' investment in 2011 or at any time prior thereto.

I.     **The BreastCare Device's Clinical Studies Were Outdated and No Longer Relevant**

102.     Defendants also intentionally misrepresented the relevancy of several clinical studies described in the offering materials.  The PPM states:

> Several clinical studies have been complete with a patient population in excess of 5,000 women, spanning several countries and involving physicians from a few of the world's most prestigious hospitals including US News & World Reports' Top-Ranked Hospitals for Cancer, MD Anderson and Memorial Sloan Kettering.

*See* Attachment A, pg. 12.  Defendants' offering materials also contained a table that summarized six clinical studies conducted for the BreastCare Device.  *See* Attachment A, pg. 17.

103.     However, Defendants failed to disclose to Plaintiffs that the aforementioned clinical studies were outdated because they were conducted, upon information and belief, more than ten (10) years prior to plaintiffs' investment in August 2011 and six (6) years prior to certain plaintiffs' investment in 2007.

J.     **Defendants' Financial Projections were Misleading**

104.     Defendants also intentionally presented Plaintiffs with misleading and unrealistic financial projections in order to induce Plaintiffs to contribute capital to the fledgling company.

105.    For example, Defendants' Revenue and Expense Projection indicated that Life Medical's gross revenues would grow from $18 million in year one to $615 million by the third year.  In other words, Life Medical projected a 3400% increase in gross revenues.

106.    Based upon various factors, including the fact that Life Medical did not possess adequate funds to sustain growth, a patent, FDA approval, or an ability to manufacture sufficient quantities of the BreastCare Device (if at all), Life Medical's financial projections were unrealistic and pure fantasy.

107.    In addition to the unrealistic nature of Life Medical's financial projections, Defendants' offering materials also lacked sufficient disclaimers concerning the accuracy of Life Medical's financial projections.

**K.    Defendants Failed to Convene Shareholder Meetings or Provide Shareholders with Updated Financial Projections**

108.    Life Medical last held a shareholder meeting on September 19, 2011.

109.    Since the last meeting, Life Medical has not convened, nor to date, scheduled an annual meeting of shareholders despite the requirements to do so under Delaware Law, the state of incorporation, or under New York Law under which Life Medical currently conducts business under a Certificate of Authority filed with the New York State Secretary of State.

110.    Certain plaintiffs requested financial documents from Fitzgerald on December 7, 2011.

111.    On December 9, 2011, Fitzgerald represented that Life Medical would be preparing year end financials to share with the shareholders. However, upon year-end, Life Medical failed to provide Plaintiffs with any financial documents or updates concerning the status of their investments.

112.    Throughout the first half of 2012, Life Medical's shareholders requested financial documents and grew worried about the status of their investments in Life Medical.  Indeed, during a board meeting on June 22, 2012, Director Oliver Jack Reynolds, the sole investor/board member, creditor, and secretary of the corporation, reiterated his request for Ms. Fitzgerald's resignation as President and CEO of Life Medical and his demand for access to the company's books and records, current shareholders list, and current bylaws.

113.    On June 27, 2012, Terence Herzog, a fellow Life Medical shareholder, demanded inspection of Life Medical's books and records pursuant to Section 220(b) of the Delaware General Corporation Law, for the following purposes:

    a.    To investigate possible wrongdoing or mismanagement, self-dealing and corporate waste by Carol Fitzgerald, the Company's CEO in connection with the abuse of cocaine, marijuana and alcohol as cited by several Company shareholders.

    b.    To investigate possible misappropriation of Company funds, concerning the CEO's control over the Company's bank accounts, at times during her use of cocaine, marijuana and alcohol.

    c.    To investigate possible self-dealing by Carol Fitzgerald in relation to the retention of financial and/or legal counsel by Carol Fitzgerald; including financial consultants and stock appraisers relating to Carol Fitzgerald's potential tax liability for receipt of ten million shares of Company common stock.

    d.    To investigate possible self-dealing by Carol Fitzgerald in relation to the retention of legal counsel by Carol Fitzgerald; relating to Carol Fitzgerald's use of legal counsel to protect herself and her own interests.

    e.    To determine whether Carol Fitzgerald, Peter Kelly, Terry Lierman and Joseph Santana are suitable to serve as Board of Directors of the Company.

    f.    To investigate possible misrepresentations and misleading statements made by Carol Fitzgerald to potential investors and Company shareholders.

114.    Mark Polinsky, along with another shareholder, personally contacted Santana about Fitzgerald's drug and alcohol problem.  Mr.  Santana assured Mr. Polinsky that he "would do something about her."

115.    Notwithstanding Fitzgerald's drug and alcohol abuse, on June 30, 2012, Santana reaffirmed Life Medical's board of director's incompetence when he informed the shareholders that Ms. Fitzgerald had resigned as President and Chief Executive Officer, but was elected as Vice Chairman of the Board of Directors and Executive Vice President of Business Development.

116.    Santana also informed shareholders that Richard Glaser had been appointed as President and Chief Executive Officer.

117.    On July 6, 2012, President Glaser responded to Mr. Herzog's demand for inspection and addressed some of Mr. Herzog's accusations:

> As you know, I have only recently been appointed as President and CEO of Life Medical. Please understand that I am my own person and have no desire to reward anyone whose past conduct on behalf of Life Medical does not merit such treatment.  The allegations which you and others have made regarding prior acts of those serving as officers of Life Medical are very serious and I and other members of the Board intend to investigate to determine the appropriate course of action.

118.    Mr. Glaser acknowledged that he received surveillance photos showing cocaine, marijuana and alcohol use by Ms. Fitzgerald from anonymous sources.  Nevertheless, Ms. Fitzgerald was allowed to remain with Life Medical and exert influence over the board of directors through her positions as Vice Chairman of the Board of Directors and Executive Vice President of Development.

119.    In or around August 2012, Life Medical provided its financial records from 2004 through 2011 to shareholders.  Accordingly, August 2012 was the first time that Plaintiffs could have possibly learned of Defendants' fraud and malfeasance.

120.    Upon information and belief, Life Medical did not maintain proper corporate books and records prior to August 2012, nor did any of the directors and officers inspect the corporate books and records to determine that the books and records were not adequately maintained.

121.    Upon information and belief, Life Medical is unable to raise additional funds due to the unwillingness of the officers and directors to share appropriate due diligence materials to prospective investors.

122.    As a direct and proximate result of Defendants' fraud, gross negligence and wanton, malicious, oppressive, and willful misconduct, Plaintiffs suffered a complete loss of their investments for which Defendants are liable and Plaintiffs are owed damages.

## AS AND FOR A FIRST CAUSE OF ACTION

### (Fraud in Violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b), and Rule 10b-5 Against Life Medical and Fitzgerald)

123.    Plaintiffs, repeat, reiterate, and re-allege each and every allegation set forth in paragraphs 1-122 with the same force and effect as though set forth fully herein.

124.    Life Medical intentionally or recklessly misrepresented and/or omitted material information to the Plaintiffs in connection with the purchase of shares in Life Medical, including: 1) the amount of funds required and/or how the funds invested would be used to bring the BreastCare Device to the market; 2) Defendants' intention to use the investment funds to satisfy prior legal settlements and obligations; 3) the status of the BreastCare Device's regulatory approvals and patents; 4) Life Medical's manufacturing capabilities; 5) the BreastCare Device's

international marketing initiatives and prospect for sales in overseas markets; 6) Life Medical's

evaluation by Atlantic Accelerator, Ltd.; 7) Life Medical's exclusive distribution agreement with

a Canadian healthcare company; 8) the relevancy of BreastCare Device's clinical studies; 9) the

accuracy and legitimacy of the financial data and financial projections.

125.    Each of the aforementioned representations are contained in the PPM and offering

materials provided to the plaintiffs and are false or misleading as detailed in Paragraphs 77-107.

126.    Fitzgerald, specifically, intentionally or recklessly misrepresented to the Plaintiffs

in connection with the purchase of shares in Life Medical that all of the $2.5 million funding had

already been raised at the time the Plaintiffs invested in Life Medical in August 2011.

127.    Fitzgerald also intentionally or recklessly misrepresented to Plaintiffs in

connection with the purchase of shares in Life Medical that all of its investment would be

allocated towards bringing the BreastCare Device to the market.  Instead, Life Medical used

Plaintiffs' investment towards legal fees owed, personal use and corporate waste.  In particular,

Life Medical used a substantial portion of Plaintiffs' investment, if not all, to satisfy a $400,000

legal settlement, despite repeated assurances Plaintiffs' investments would only be used to bring

the BreastCare Device to market.

128.    In 2011, Fitzgerald also intentionally or recklessly misrepresented the per share

value of Life Medical's common stock to Plaintiffs.  Fitzgerald sold Plaintiffs shares in Life

Medical at $1.00 per share, which corresponded to Life Medical's financial statements, yet on

federal tax returns Fitzgerald reported the per share value of Life Medical at $.0002.

129.    Life Medical intentionally, knowingly and/or recklessly misrepresented the

following information to Plaintiffs in August 2011 because only Life Medical had access to the

following private and confidential information:  1) the amount of funds required and/or how the

27

funds invested would be used to bring the BreastCare Device to the market; 2) Life Medical's intention to use the investment funds to satisfy prior legal settlements and obligations; 3) the status of the BreastCare Device's regulatory approvals and patents; 4) Life Medical's manufacturing capabilities; 5) the BreastCare Device's international marketing initiatives and prospect for sales in overseas markets; 6) Life Medical's evaluation by Atlantic Accelerator, Ltd.; 7) Life Medical's exclusive distribution agreement with a Canadian healthcare company; 8) the relevancy of BreastCare Device's clinical studies; 9) the accuracy and legitimacy of the financial data and financial projections; 10) and the amount of funds that had been raised as of August 2011; and 11) the book value of Life Medical.

130.    Moreover, Life Medical and Fitzgerald knew or recklessly disregarded that Plaintiffs would rely upon the materially false and misleading statements contained in the PPM and Fitzgerald's oral misrepresentations when deciding to invest and remain invested in Life Medical.

131.    Plaintiffs reasonably relied upon these misstatements when decided to invest in Life Medical, and would not have invested in Life Medical had they known that Life Medical and Fitzgerald's written and oral statements were materially false and misleading.

132.    By virtue of the foregoing, Life Medical and Fitzgerald violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder in that it, directly or indirectly, by use of the means or instrumentalities of interstate commerce and/or the mails, or of a facility of a national securities exchange, knowingly or recklessly employed devices, schemes, and artifices to defraud, made untrue statements of material facts or omitted to state facts that they were under a duty to speak, and engaged in acts of fraud and deceit upon plaintiffs, all in connection with the purchase or sale of a security.

133.    Plaintiffs have been damaged by the wrongful conduct of Life Medical and Fitzgerald in that it caused Plaintiffs to invest to purchase and hold shares in Life Medical at inflated values because Life Medical was not worth the same without the aforementioned level of funding, patent, FDA approval, or ability to manufacture sufficient quantities of the BreastCare Device, and also caused Plaintiffs to lose all of its investment in Life Medical when it became insolvent in or around 2012.

134.    Plaintiffs did not discover the aforementioned fraud or that it had suffered damages until August 2012, at the earliest, due to the illiquid and private nature of these investments, coupled with the fact that Life Medical failed to provide any shareholders with updated or accurate financial statements until August 2012.  Due to the fact that Life Medical is a private corporation and does not file public financial documents, Plaintiffs could not have reasonably uncovered the fraud or that they had suffered damages until August 2012, at the earliest.

135.    As a direct and proximate result of the foregoing misconduct, Plaintiffs are entitled to rescission, or in the alternative compensatory damages together with interest at the maximum allowable rate.

### AS AND FOR A SECOND CAUSE OF ACTION

**(For Violations of Section 20(a) of the
Securities Exchange Act of 1934 Against Life Medical)**

136.    Plaintiffs, repeat, reiterate, and re-allege each and every allegation set forth in paragraphs 1-135  with the same force and effect as though set forth fully herein.

137.    As alleged more fully above, the conduct of Fitzgerald violated Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder.

138.    At all relevant times, Life Medical and the Board of Directors had the power, both direct and indirect, to control Fitzgerald, and did in fact exercise such control and was therefore controlling a person within the meaning of Section 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. § 78(t)).

139.    Plaintiffs have been damaged by the wrongful conduct of Fitzgerald in that she caused Plaintiffs to invest to purchase and hold shares in Life Medical at inflated values because Life Medical was not worth the same without the aforementioned level of funding, patent, FDA approval, or ability to manufacture sufficient quantities of the BreastCare Device, and also caused Plaintiffs to lose all of its investment in Life Medical when it became insolvent in or around 2012.

140.    Plaintiffs did not discover the fraud or that it had suffered damages until August 2012, at the earliest, as a result of the illiquid and private nature of these investments, coupled with the fact that Life Medical failed to provide any shareholders with updated or accurate financial statements until August 2012.  Due to the fact that Life Medical is a private corporation and does not file public financial documents, Plaintiffs could not have reasonably uncovered the fraud or that they had suffered damages until August 2012, at the earliest.

141.    As a direct and proximate result of the foregoing misconduct, Plaintiffs are entitled to rescission, or in the alternative, compensatory damages together with interest at the maximum allowable rate.

## AS AND FOR A THIRD CAUSE OF ACTION

### (Negligent Misrepresentation Against Life Medical and Fitzgerald)

142.    Plaintiffs, repeat, reiterate, and re-allege each and every allegation set forth in paragraphs 1-141 with the same force and effect as though set forth fully herein.

143.    As detailed above in Paragraphs 77-107, Life Medical and Fitzgerald carelessly and negligently misrepresented and/or omitted material information in the PPM and offering materials provided to Plaintiffs in connection with the purchase of shares in Life Medical, including: 1) the amount of funds required and/or how the funds invested would be used to bring the BreastCare Device to the market; 2) Life Medical's intention to use the investment funds to satisfy prior legal settlements and obligations; 3) the status of the BreastCare Device's regulatory approvals and patents; 4) Life Medical's manufacturing capabilities; 5) the BreastCare Device's international marketing initiatives and prospect for sales in overseas markets; 6) Life Medical's evaluation by Atlantic Accelerator, Ltd.; 7) Life Medical's exclusive distribution agreement with a Canadian healthcare company; 8) the relevancy of BreastCare Device's clinical studies; 9) the accuracy and legitimacy of the financial data and financial projections.

144.    Life Medical and Fitzgerald provided the PPM and offering materials to Plaintiffs in order to induce Plaintiffs to invest in Life Medical.

145.    Plaintiffs reasonably relied upon these misstatements when they decided to invest in Life Medical, and would not have invested in Life Medical had they known that Life Medical and Fitzgerald's written and oral statements were materially false and misleading.

146.    Plaintiffs did not discover the fraud or that it had suffered damages until August 2012, at the earliest, as a result of the illiquid and private nature of these investments, coupled with the fact that Life Medical failed to provide any shareholders with updated or accurate financial statements until August 2012.  Due to the fact that Life Medical is a private corporation and does not file public financial documents, Plaintiffs could not have reasonably uncovered the fraud or that they had suffered damages until August 2012, at the earliest.

147.    As a direct and proximate result of the foregoing misconduct, Plaintiffs are entitled to rescission, or in the alternative, compensatory damages together with interest at the maximum allowable rate.

## AS AND FOR A FOURTH CAUSE OF ACTION

### (Common Law Fraud Against Life Medical and Fitzgerald)

148.    Plaintiffs, repeat, reiterate, and re-allege each and every allegation set forth in paragraphs 1-147 with the same force and effect as though set forth fully herein.

149.    As alleged more fully above, Life Medical and Fitzgerald intentionally, knowingly and recklessly misrepresented information contained in the PPM and offering materials to Plaintiffs in connection with the purchase of shares in Life Medical.

150.    Fitzgerald intentionally, knowingly and recklessly misrepresented to Plaintiffs that all of the $2.5 million funding had already been raised at the time Plaintiffs invested in Life Medical in August 2011.

151.    Fitzgerald intentionally, knowingly and recklessly misrepresented to all Plaintiffs that all of their investments would be allocated towards bringing the BreastCare Device to the market.  Instead, Life Medical used Plaintiffs' investment towards legal fees owed, personal use and corporate waste.

152.    Fitzgerald, specifically, raided corporate assets in order to feed her alcohol and drug abuse during the relevant time period.

153.    Plaintiffs reasonably relied upon misrepresentations contained in the PPM when they decided to invest in Life Medical, and would not have invested in Life Medical had they known that Life Medical and Fitzgerald's written and oral statements were materially false and misleading.  Moreover, all Plaintiffs relied upon Fitzgerald's representations that their

investments would be allocated towards bringing the BreastCare Device to the market and could not possibly have imagined that their investments would be used to in order to satisfy Fitzgerald's alcohol and drug abuse during the relevant time period.

154.    Plaintiffs did not discover the fraud or that they had suffered damages until August 2012, at the earliest, due to the illiquid and private nature of these investments, coupled with the fact that Life Medical failed to provide any shareholders with updated or accurate financial statements until August 2012.  Due to the fact that Life Medical is a private corporation and does not file public financial documents, Plaintiffs could not have reasonably uncovered the fraud or that they had suffered damages until August 2012, at the earliest.

155.    As a direct and proximate result of the foregoing misconduct, Plaintiffs suffered damages and are entitled to rescission, or in the alternative, compensatory damages together with interest at the maximum allowable rate.

## AS AND FOR A FIFTH CAUSE OF ACTION

### (Breach of Fiduciary Duty of Care and Loyalty against Director Defendants)

156.    Plaintiffs, repeat, reiterate, and re-allege each and every allegation set forth in paragraphs 1-155 with the same force and effect as though set forth fully herein.

157.    Fitzgerald owed Plaintiffs fiduciary duties during the solicitation phase and prior to Plaintiffs' investment in Life Medical because Fitzgerald, as CEO and President of Life Medical, maintained a superior position and access to private and confidential information concerning Life Medical.  Moreover, Fitzgerald owed Plaintiffs, who later became shareholders, fiduciary duties to correct and/or modify fraudulent and misleading misstatements made during the solicitation phase.

158.    Director Defendants owed Plaintiffs fiduciary duties by reason of their positions as Life Medical's Directors, and because of their ability to control Life Medical's business, corporate and financial affairs.  Director Defendants owed Plaintiffs the duty of loyalty and the duties to exercise oversight, due care and diligence in the management and administration of Life Medical's affairs, and in the use and preservation of its property, assets and shareholder investments.

159.    Director Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls and financial affairs of Life Medical pursuant to their fiduciary obligations to use the same care and diligence as would an ordinary prudent person in a like position.

160.    Director Defendants breached their fiduciary duties of <u>care</u> through lack of oversight in a willful, reckless and/or grossly negligent manner, by among other things:

   a.  Failing to inspect the corporate books and records, including failing to ensure that corporate books and records were being maintained at all;

   b.  Failing to have the corporate books and records audited by an independent account;

   c.  Failing to manage, conduct, supervise and direct Life Medical's business and affairs in accordance with Delaware and New York Law, including but not limited to, failing to convene a shareholder meeting for greater than one year;

   d.  Squandering Life Medical's limited financial resources by fortifying their control of Life Medical through a series of share issuances to themselves, retaining legal counsel paid from Life Medical's funds to protect legal challenges to their incumbency, and overpaying for the services of officers and directors who were loyal to Fitzgerald personally over the interests of Life Medical and its shareholders;

   e.  Wasting limited and valuable time that Life Medical holds the exclusive rights to market and develop the BreastCare Device;

      f.   Soliciting potential investors, including Plaintiffs, by means of a PPM that contained numerous misrepresentations and omissions in violation of applicable federal and state law; and

      g.   Failing to maintain Life Medical's patents, federal regulatory approvals, business relationships, manufacturing capabilities, international marketing initiatives, and distribution agreements in good standing.

161.    Santana, Kelly and Lierman, specifically, breached their fiduciary duties of <u>care</u> through lack of oversight in a willful, reckless and/or grossly negligent manner, by among other things:

      a.   Failing to supervise Ms. Fitzgerald's activities, including syphoning corporate assets for personal use and illicit behavior;

      b.   Failing to terminate Ms. Fitzgerald upon receiving a surveillance tape of her using illegal substances; and

      c.   Failing to supervise or knowingly permitting Fitzgerald to violate applicable federal and state law with respect to soliciting investments on behalf of Life Medical.

162.    Santana, Kelly and Lierman breached their fiduciary duties of <u>loyalty</u> by, among other things:

      a.   Concealing the extent of corporate malfeasance by negligently maintaining and/or fraudulently manipulating Life Medical's corporate books and records, including financial documents, during the relevant time period; and

      b.   Concealing the extent of corporate malfeasance by failing to convene a shareholder meeting for greater than one year.

163.    Fitzgerald breached her fiduciary duty of <u>loyalty</u> in a willful, reckless and/or grossly negligent manner, by among other things:

      a.   Engaging in self-dealing by syphoning corporate assets for personal use;

      b.   Engaging in illicit and illegal behavior using corporate assets; and

      c.   Obstructing the other board of director's supervision of Life Medical's business and financial condition by failing to maintain corporate books and records and/or

fraudulently manipulating Life Medical's corporate books and records, including financial documents, during the relevant time period.

164.    Director Oliver Jack Reynolds is the only Life Medical director who fulfilled his fiduciary duties to Life Medical and its shareholders when, in 2012, he called for Ms. Fitzgerald's resignation as President and CEO of Life Medical and demanded access to the company's books and records, current shareholders list, and current bylaws.

165.    Plaintiffs have been damaged by Director Defendants' willful, reckless and/or grossly negligent misconduct because Plaintiffs purchased and held shares in Life Medical at inflated values because Life Medical was not worth the same without the aforementioned level of funding, patent, FDA approval, or ability to manufacture sufficient quantities of the BreastCare Device, and also caused Plaintiffs to loss all of its investment in Life Medical when it became insolvent in or around 2012.

166.    Director Defendants' collective breach of fiduciary duties and loyalty is a departure from any reasonable and ordinary due care exhibited by directors and is not protected under the law, whether by statute or common law, including the business judgment rule.

167.    As a result of Director Defendants' breaches of their fiduciary duties, Plaintiffs have suffered and continue to suffer economic losses in an amount of be determined according to proof at trial.

## <u>AS AND FOR A SIXTH CAUSE OF ACTION</u>

### (<u>Common Law Negligence against Life Medical and Director Defendants</u>)

168.    Plaintiffs, repeat, reiterate, and re-allege each and every allegation set forth in paragraphs 1-167 with the same force and effect as though set forth fully herein.

169. Life Medical and Director Defendants owed Plaintiffs duties of ordinary and reasonable care and good faith which arose as a result of Plaintiffs' investments in Life Medical and status as shareholders.

170. Life Medical and Director Defendants breached their duties of ordinary and reasonable care by, among other things: by among other things:

    a. Failing to inspect the corporate books and records, including failing to ensure that corporate books and records were being maintained at all;

    b. Failing to have the corporate books and records audited by an independent account;

    c. Failing to manage, conduct, supervise and direct Life Medical's business and affairs in accordance with Delaware and New York Law, including but not limited to, failing to convene a shareholder meeting for greater than one year;

    d. Squandering Life Medical's limited financial resources by fortifying their control of Life Medical through a series of share issuances to themselves, retaining legal counsel paid from Life Medical's funds to protect legal challenges to their incumbency, and overpaying for the services of officers and directors who were loyal to Fitzgerald personally over the interests of Life Medical and its shareholders;

    e. Wasting limited and valuable time that Life Medical holds the exclusive rights to market and develop the BreastCare Device;

    f. Failing to maintain Life Medical's patents, federal regulatory approvals, business relationships, manufacturing capabilities, international marketing initiatives, and distribution agreements in good standing.

    g. Failing to supervise Ms. Fitzgerald's activities, including syphoning corporate assets for personal use and illicit behavior;

    h. Failing to terminate Ms. Fitzgerald upon receiving a surveillance tape of her using illegal substances; and

    i. Failing to supervise or knowingly permitting Fitzgerald to violate applicable federal and state law with respect to soliciting investments on behalf of Life Medical.

171.    As a direct and proximate result of Life Medical's and the Director Defendants' negligence, Plaintiffs have suffered and continue to suffer economic losses in an amount of be determined according to proof at trial.

## AS AND FOR A SEVENTH CAUSE OF ACTION

### (Unjust Enrichment Against Life Medical and Fitzgerald)

172.    Plaintiffs, repeat, reiterate, and re-allege each and every allegation set forth in paragraphs 1-171 with the same force and effect as though set forth fully herein.

173.    Life Medical and Fitzgerald solicited Plaintiffs to invest in Life Medical under false pretenses because the PPM and offering materials contained material misrepresentations and omissions, as detailed above.  Additionally, Fitzgerald misrepresented that Life Medical had already raised $2.5 million in funding that would ensure that Life Medical could bring the BreastCare Device to market quickly.  This was not true.

174.    Fitzgerald orally represented to all Plaintiffs that their investments would be allocated towards bringing the BreastCare Device to market.  This also was not true.

175.    Fitzgerald specifically engaged in self-dealing, syphoned corporate assets for personal use, and engaged in illicit and illegal behavior using corporate assets.

176.    As a result of Life Medical's and Fitzgerald's wrongful conduct as alleged herein, Plaintiffs have acquired unit investments in Life Medical that are not worth the value reported and are contrary to the descriptions and understanding of the investments as sold to them.

177.    By their wrongful acts and omissions alleged above, Life Medical and Fitzgerald received funds to which they were not entitled and were unjustly enriched at the expense of and to the detriment of Plaintiffs.

178.    Life Medical's and Fitzgerald's knowing acceptance and retention of these non-gratuitous benefits conferred by Plaintiffs under these circumstances are unjust and inequitable.

179.    No other remedy at law can adequately compensate Plaintiffs for the economic damages resulting to them from Life Medical's and Fitzgerald's wrongful actions as alleged herein.

180.    Plaintiffs seek restitution from Life Medical and Fitzgerald, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by Life Medical and Fitzgerald from their wrongful conduct.

### AS AND FOR AN EIGHTH CAUSE OF ACTION

### (Punitive Damages Against All Defendants)

181.    Plaintiffs, repeat, reiterate, and re-allege each and every allegation set forth in paragraphs 1-180 with the same force and effect as though set forth fully herein.

182.    As detailed above, Defendants breached their fiduciary duties of care and loyalty to Plaintiffs in a willful, reckless and/or grossly negligent manner that rises to the level of wantonness, malice, oppression, and willfulness sufficient to require punitive damages under New York, Illinois and Pennsylvania law.

183.    Defendants' wanton, malicious, oppressive, and willful misconduct requires an award of punitive damages so as to act as retribution against Defendants, deter Defendants from committing similar wrongs against investors in the future (especially if Life Medical ever becomes a public company) and to deter others start-up companies from similar conduct.

184.    As a result of the foregoing misconduct, Plaintiffs are entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for a judgment in their favor and against Defendants:

a)      On the First, Second, Third and Fourth Causes of Action, an order rescinding Plaintiff's investments in Life Medical, or in the alternative, compensatory damages to be determined at trial;

b)      On the Fifth, Sixth and Seventh Causes of Action, an award of compensatory damages to be determined at trial;

c)      On the Eighth Cause of Action, an award of punitive damages to be determined by a jury at trial;

d)      Awarding Plaintiffs pre-judgment and post-judgment interest pursuant to CPLR § 5001, *et seq*. on all amounts awarded in this action;

e)      Awarding Plaintiffs costs and expenses incurred in this action, including without limitation, all reasonable attorneys' costs and fees; and

f)      Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby requests a trial by jury on all issues so triable.


Dated: New York, New York
       May 13, 2014

                                        Respectfully submitted,

                                        NAPOLI BERN RIPKA SHKOLNIK, LLP

                                        By: _____ (1921)
                                                Alan S. Ripka, Esq.  1921

                                        350 Fifth Avenue, Suite 7413
                                        New York, New York 10118
                                        (212) 267-3700

                                        *Attorneys for Plaintiffs*